1  Ramzi Abadou (SBN 222567)
2  ramzi.abadou@ksfcounsel.com
   KAHN SWICK & FOTI, LLP
3  505 Montgomery Street, 10th Floor
   San Francisco, CA 94111
4  Telephone: (415) 874-3047
   Facsimile:  (504) 455-1498
5

6  Leigh A. Parker (SBN 170565)
7  WEISSLAW LLP
   1516 South Bundy Drive, Suite 309
8  Los Angeles, CA 90025
   Telephone: (310) 208-2800
9  Facsimile:  (310) 209-2348
10

11  *Co-Lead Counsel for Plaintiffs*

12  [Additional counsel appear on signature page]

13

14                UNITED STATES DISTRICT COURT
15               CENTRAL DISTRICT OF CALIFORNIA

16  IN RE AMERICAN APPAREL,      )   **Lead Case No. 14-CV-5230-MWF (JEMx)**
17  INC. 2014 DERIVATIVE         )
    SHAREHOLDER LITIGATION       )
18  _____     )   Consolidated with Case No.
                                 )   14-CV-5699-MWF (JEMx)
19                               )
20  This Document Relates To:    )   **VERIFIED CONSOLIDATED**
                                 )   **AMENDED SHAREHOLDER**
21      All Actions.             )   **DERIVATIVE COMPLAINT**
                                 )
22                               )
                                 )   **JURY TRIAL DEMANDED**
23  _____     )

24

25

26

27

28

Plaintiffs Tammy G. Federman and Charles Rendelman ("Plaintiffs"), though their undersigned counsel, respectfully submit their Verified Consolidated Amended Shareholder Derivative Complaint in the name of and on behalf of nominal Defendant American Apparel, Inc. ("American Apparel" or the "Company") against certain directors and officers of American Apparel named herein (the "Individual Defendants," as defined below, collectively with American Apparel, "Defendants").  Plaintiffs base their allegations on personal knowledge as to their own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including:  (a) review and analysis of public filings made by American Apparel and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused or allowed to be disseminated by the Company, certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on American Apparel's website concerning the Company's public statements and the conduct of the Individual Defendants; and (d) review of other publicly available information concerning American Apparel, the Individual Defendants and other persons.

## INTRODUCTION AND OVERVIEW

1.      This is a shareholder derivative action brought by shareholders of American Apparel on behalf of the Company against the Individual Defendants,

seeking to remedy the damage caused to American Apparel by the Individual Defendants' violations of law and seeking to prevent further damage to the Company's business, operations, reputation and goodwill.

2.      During most of the relevant time period herein, American Apparel's Chief Executive Officer ("CEO"), Chairman of the Board of Directors (the "Board"), and President was Defendant Dov Charney ("Charney"), the founder of the Company.  Charney has been accused of a series of heinous acts perpetrated against employees of the Company that are truly shocking, illegal, inappropriate and improper.  His conduct has caused the Company to expend substantial sums to defend American Apparel against those employees' claims, as well as to resolve them, and has also virtually ruined the Company's reputation and credibility in the business community.

3.      Moreover, Charney, under the Individual Defendants' direction and supervision, has completely mismanaged the Company.  American Apparel has been unable to hire, let alone retain, qualified and experienced personnel because of Charney's notoriously outrageous conduct.  At one point in time the personnel situation had become so dire that the Company's General Counsel was forced to oversee the operations of the 246 individual American Apparel retail stores.  As a result, the Company's financial condition, as well as its stock price, has spiraled out of control.  Moreover, the costs of borrowing, essential to maintain

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

American Apparel as a going concern, have skyrocketed, along with insurance premiums, as a result of Charney's mismanagement and misconduct.

4. The Individual Defendants were well aware of Charney's misconduct – the details were spelled out in complaints and news articles spanning nearly a decade – but chose neither to investigate nor to take any action to prevent Charney from further damaging the Company and its business prospects. Ultimately, the Board decided to terminate Charney but did so in a manner devoid of any sense of business judgment and that not only heaped more damage upon the Company, but also gave Charney a strong defense to his ouster.

5. On June 18, 2014, the Company's Board voted to replace Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause because of his numerous breaches of fiduciary duty and illegal conduct.

6. At the time they voted to suspend Charney, the Individual Defendants knew that certain of the Company's financing agreements with creditors, including a creditor with personal ties to Charney, covenanted that Charney serve at the helm of the Company. Regardless, the Individual Defendants failed to take the necessary and prudent action of securing waivers of those provisions from the Company's creditors or securing alternative financing before terminating Charney. As a result, after Charney was terminated, the Company was

held in default on one of its loans, which, because of cross-default provisions, would trigger default on the Company's line of credit as well.

7.       In addition, the Individual Defendants failed to timely adopt defensive measures to prevent Charney from increasing his holdings of American Apparel stock after his suspension.  At the time of the Board's decision, the only reasonable and prudent action for the Board to take was simultaneously, or at least shortly thereafter, to enact a shareholder rights plan to deter Charney from regaining a majority or controlling stake in the Company.  Instead, the Individual Defendants breached their fiduciary duties by failing to do anything to prevent this eventuality.  Indeed, Charney reached an agreement with Standard General L.P. ("Standard"), one of American Apparel's largest shareholders, to regain a controlling stake in the Company.

8.       Further, the Board only gave Charney nine hours to respond to the Board's demand that he voluntarily resign.  This poorly considered ultimatum gave Charney a powerful defense to the Board's action.  Indeed, Charney's counsel has asserted that the short time frame of that ultimatum violated Charney's right to confer with counsel and his rights pursuant to the Age Discrimination in Employment Act, which requires twenty-one days to consider any proposed severance agreement.  Charney has filed an arbitration petition against the Company alleging wrongful termination and retaliation.  Thus, Charney has not

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

only a possible defense to his suspension, but also substantial leverage to employ against the Board to retain his positions with the Company to the detriment of American Apparel and its shareholders.  Indeed, Charney reached an agreement with Standard General L.P. ("Standard"), one of American Apparel's largest shareholders, to regain a controlling stake in the Company.

9.      Due to the Individual Defendants' fiduciary breaches, on July 9, 2014, the Company was forced to enter into a Standstill and Support Agreement with Standard and Charney (the "Support Agreement").   The Individual Defendants thereby breached their fiduciary duties again by agreeing to the one-sided and conflicted Support Agreement.  The Support Agreement required that Charney remain as a paid consultant of the Company while a second investigation into his misconduct was conducted, and that the investigation would be overseen by a special committee that is plainly conflicted in that it will be constituted by appointees selected by, among others, Standard, Charney's partner, and the head of the Audit Committee that turned a blind eye to Charney's misconduct during the relevant period.

10.      Throughout the relevant period, under the Individual Defendants' direction and control, Charney breached his duties to the Company and its shareholders by consciously and repeatedly engaging in improper and illegal conduct, exposing the Company to the expense and distraction of a multitude of

lawsuits, by mismanaging the Company's business and operations, and by making it more difficult, and expensive, for the Company to obtain financing and insurance.

11.     The Individual Defendants utterly failed to ensure that sufficient internal controls existed at the Company, failed to prevent its officers (from the CEO on down) from engaging in improper and illegal conduct, and ignored myriad red flags for years that required Charney to be terminated for cause.   The Individual Defendants' failure to institute sufficient controls to prevent the brazen impropriety of Charney's conduct and failure to terminate Charney years ago constitute breaches of their fiduciary duties to the Company and its shareholders. Had the Individual Defendants investigated and taken action when they were put on notice of Charney's illegal acts, as they were required to do, the damage caused to American Apparel, or at least a substantial portion thereof, could have been prevented.

12.     The Individual Defendants, however, chose not to take timely action because Charney, as the largest shareholder of American Apparel, was largely responsible for their appointment to the Board and for the retention of their lucrative positions.  Indeed, the Company's Board was "handpicked" by Charney.

13.     As a result of the Individual Defendants' conduct, American Apparel has been irreparably harmed.  Given the Individual Defendants' knowing

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

decisions to turn a blind eye to Charney's illegal conduct, the magnitude and duration of that improper conduct, the severe and negative impact that misconduct has had on the Company's operations, management and financial results, and the substantial likelihood that American Apparel's directors will be held liable, a demand to pursue action to recover from the Individual Defendants the damages they caused would be a wasteful and futile act.  Absent this lawsuit, the wrongdoers will not be called to account for their violations of the law, and the Company's substantial damages will not be recovered.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action was not brought collusively to confer jurisdiction on the Court that it would not otherwise have.

15.     The Court has personal jurisdiction over each of the Individual Defendants and Nominal Defendant American Apparel because each is either a corporation that conducts business in and maintains operations in this District or an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Moreover, each Individual Defendant has had

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

extensive contacts with California as a director and/or officer of American Apparel or otherwise, which makes the exercise of personal jurisdiction over them proper.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, American Apparel has a substantial presence in the State of California, and is headquartered in Los Angeles, and because many of the acts alleged and complained of herein occurred in this District. Moreover, each Individual Defendant has had extensive contacts with California as a director and/or officer of American Apparel or otherwise, which makes the exercise of personal jurisdiction over them proper.

## PARTIES AND OTHER PERSONS

### A.     Plaintiffs

17.     Plaintiff Tammy G. Federman is and has been at all times relevant herein an owner and holder of American Apparel common stock.  She is a citizen of Texas.

18.     Plaintiff Charles Rendelman is and has been at all times relevant herein an owner and holder of American Apparel common stock.  He is a citizen of Washington, D.C.

**B.** **Nominal Defendant**

19.          Nominal Defendant American Apparel, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located at 747 Warehouse Street, Los Angeles, California 90021.

**C.** **Defendants**

20.          Defendant Charney served as Chairman of the Board, CEO and a director of American Apparel from December 12, 2007, until June 18, 2014, when the Board voted to replace Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause, which, under the terms of Charney's employment agreement, would have become effective thirty days thereafter.  Pursuant to the Support Agreement, Charney continues to serve as a paid strategic consultant to the Company.  Charney is the founder, and served as the director, chief executive officer and president, of American Apparel's predecessor companies since their formation in Columbia, South Carolina, in 1989. Charney owns approximately 43% of the Company's outstanding common stock and is the largest shareholder of American Apparel.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Charney received in salary, bonuses, stock awards, option awards, and other compensation approximately $1,065,444 in 2013, $14,495,868 in 2012, and $11,606,144 in 2011.  Charney is a citizen of California.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

21.     Defendant Alberto Chehebar ("Chehebar") was appointed to the Board in February 2012. Chehebar served as a member of the Nominating and Corporate Governance Committee of the Board (which has subsequently been split into the Nominating Committee and Enterprise Risk Management Committee) during the relevant period. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Chehebar received approximately $80,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. Chehebar resigned from the Board on July 9, 2014, as required by the Support Agreement. Chehebar is a founder and director of Stilotex S.A. since 1992; a partner of Pepe Ganga since 2006; and a partner and director of Blu Logistics since 2008. Chehebar is a citizen of Colombia.

22.     Defendant David Danziger ("Danziger") has served as a director of American Apparel since June 2011. Danziger served as the chair of the Audit Committee during the relevant period. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Danziger received approximately $97,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. On June 18, 2014, Danziger was appointed a Co-Chairman of the Board to replace Charney. Danziger is also an accountant and senior partner at MSCM, LLP, Chartered Accountants and a director of Eurotin, Inc., Carpathian Gold Inc., and Renforth Resources, Inc. Danziger is a citizen of Canada.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

23.     Defendant Robert Greene ("Greene") was appointed to the Board in December 2007, when the Company went public.  Greene served as the chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee of the Board during the relevant period.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Greene received approximately $89,500 in salary, bonuses, stock awards, option awards, and other compensation in 2013.  Greene resigned from the Board on July 9, 2014, as required by the Support Agreement.  Greene is a private consultant as well as an author of business strategy books.  Greene is a citizen of California.

24.     Defendant Marvin Igelman ("Igelman") was appointed to the Board in July 2011.  Igelman served as a member of the Audit Committee.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Igelman received approximately $87,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013.  Igelman resigned from the Board on July 9, 2014, as required by the Support Agreement.  From February 2010 to June 2011, Igelman was Chief Strategy Officer of Poynt Corporation and, from May 2006 to February 2010, he was Chief Executive Officer of Unomobi Incorporated.  Igelman is a citizen of Canada.

25.     Defendant William Mauer ("Mauer") was appointed to the Board in November 2011.  Mauer served as a member of the Audit Committee, the

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Compensation Committee and the Nominating and Corporate Governance Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Mauer received approximately $88,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013.  Mauer resigned from the Board on July 9, 2014, as required by the Support Agreement.  Mauer is also a partner at the law firm Lapin Mauer and, since 2008, Governor of the Bar of Quebec.  Mauer is a citizen of Canada.

26.     Defendant Allan Mayer ("Mayer") has served as a director of American Apparel since December 2007, when the Company went public.  Mayer served as the chair of the Compensation Committee.  Mayer currently serves as a member of the Compensation Committee and the Enterprise Risk Management Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Mayer received approximately $105,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013.  Mayer was appointed a Co-Chairman of the Board to replace Charney.  Mayer is also a partner of 42 West LLC, a public relations firm.  From 1997 until 2006, Mayer was managing director of Sitrick and Company.  Mayer is a citizen of California.

27.     Defendants Charney, Chehebar, Danziger, Greene, Igelman, Mauer and Mayer are referred to collectively throughout this Complaint as the "Individual Defendants" or the "Board."

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>GENERAL FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

28.     The Individual Defendants had stringent fiduciary obligations to American Apparel and its shareholders.

29.     By reason of their positions as directors, officers, and/or fiduciaries of American Apparel and because of their ability to control its business and corporate affairs, the Individual Defendants owed American Apparel and its shareholders the highest fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage American Apparel in a fair, just, honest and equitable manner.

30.     The Individual Defendants were and are required to act in the best interests of American Apparel and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

31.     Each director and officer of the Company owes to American Apparel and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true financial condition and prospects.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of American Apparel, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with American Apparel, each of the Individual Defendants had access to adverse, non-public information about the financial condition and operations of American Apparel.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of American Apparel, and was at all times acting within the course and scope of such agency.

34.     To discharge their duties, the officers and directors of American Apparel were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of American Apparel were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, businesslike manner, to provide the highest-quality performance of the Company's business, to avoid wasting the Company's assets, and to maximize the Company's value;

(b)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects and ensuring that the Company maintained an adequate system of financial controls such that the Company's accounting and financial reporting would be true and accurate at all times;

(c)     ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

(d)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(e)     ensure that there were sufficient checks and balances in American Apparel's accounting, finance, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of income, revenues and cash flow; and

(f)     ensure that no inaccurate information about American Apparel was released to the public that would tend to artificially inflate American Apparel's stock and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their fiduciary duties, the absence of good faith on their part, and a knowing, reckless and grossly negligent disregard for their duties to the Company and its shareholders.  The Individual Defendants were aware, or should have been aware, that those violations, the absence of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised American Apparel's Board.

## SPECIFIC FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     Aside from their legally imposed duties as officers and/or directors of a publicly traded company organized under Delaware law, the Individual Defendants were also subject to particularized duties pursuant to specific policies in effect at American Apparel.

### Duties Arising from American Apparel's Code of Ethics

37.     American Apparel's Code of Ethics (the "Code") imposes substantial duties upon all of American Apparel's officers, directors, and employees.  The Code states, in pertinent part:

**Honest, Ethical and Fair Conduct**

***Each person owes a duty to the Company to act with integrity.***
Integrity requires, among other things, being honest, fair and candid.
Deceit, dishonesty and subordination of principle are inconsistent with
integrity. Service to the Company never should be subordinated to
personal gain and advantage.

Each person must:

- ***Act with integrity, including being honest and candid*** while
  still maintaining the confidentiality of the Company's
  information where required or in the Company's interests.

- ***Observe all applicable governmental laws, rules and
  regulations.***

- Adhere to a high standard of business ethics and not seek
  competitive advantage through unlawful or unethical business
  practices.

- ***Deal fairly with the Company's*** customers, suppliers,
  competitors and ***employees.***

- ***Refrain from taking advantage of anyone*** through
  manipulation, concealment, abuse of privileged information,

misrepresentation of material facts or any other unfair-dealing practice.

<div align="center">***</div>

**Compliance**

It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules and regulations, including those relating to accounting and auditing matters.

**Reporting and Accountability**

***The Board of Directors or Audit Committee, if one exists, of [American Apparel] is responsible for applying this Code*** to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation.

(Emphasis added.)

## Duties Arising from American Apparel's Corporate Governance Guidelines

38.     American Apparel's Corporate Governance Guidelines (the "Guidelines") outline the responsibility and function of the Board, including

specifically overseeing the Company's Chief Executive Officer.  The Guidelines state, in pertinent part:

**Role of Directors**

The business and affairs of the Company shall be managed by or under the direction of the Board. A director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. …

**The Board's Goals**

The Board's goals are to build long-term value for the Company's stockholders and to assure the vitality of the Company for its customers, employees and the other individuals and organizations who depend on the Company.

To achieve these goals, ***the Board will monitor*** both the performance of the Company (in relation to its goals, strategy and competitors) and ***the performance of the Chief Executive Officer, and offer him or her constructive advice and feedback.***

(Emphasis added.)

39.     Further, the Guidelines provide that:   "The non-management directors of the Company shall meet in executive session without management on a

regularly scheduled basis, but no less than four times a year at each regularly scheduled Board meeting."

### Duties of the Audit Committee

40.     Defendants Danziger, Igelman and Mauer were members of the Audit Committee during the relevant time period.  Defendant Danziger continues to serve on the Audit Committee.

41.     The primary purpose of the Audit Committee is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries.

42.     The Audit Committee's Charter further states that that the Audit Committee has, among other duties, the responsibility to:

- *Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures* through inquiry and discussions with the Corporation's independent auditors and management of the Corporation.

- Review with management the Corporation's administrative, operational and accounting internal controls, including controls and security of the computerized information systems, and

*evaluate whether the Corporation is operating in accordance with its prescribed policies, procedures and codes of conduct.*

- Manage and oversee various risks faced by the Corporation and its subsidiaries, and assess, monitor and control such risks.

- Receive regular reports from the Corporation's management on (i) the risks presented by the Corporation's operations and (ii) the systems and processes that have been implemented to identify, mitigate and manage those risks.

- *Review and evaluate the Corporation's practices regarding the identification, mitigation and management of risks*, including the risks identified by the other committees of the Board. Examples of areas of oversight may *include*: (i) Financial and liquidity risks; (ii) Legal aspects of international operations, including fraud, bribery and corruption; (iii) Risks associated with manufacturing operations, including labor-related and regulatory matters, natural disasters and acts of terrorism; (iv) *Compliance with laws and regulations*, including those related to product liability, health and safety, and environmental; (v) Appropriate insurance coverage; (vi) Protection of our intellectual property and security of our data; (vii) Antitrust and

responses to competition; (viii) *Human resource matters, including compliance with employment policies of the Corporation; and (ix) Public policy, social responsibility and general reputation*.

- *Meet annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters*, including any matters that may have a material impact on the financial statements of the Corporation.

- *Review the policies and procedures with respect to officers' expense accounts and perquisites*, including the use of corporate assets.

- *Review the Corporation's program to monitor compliance with the Corporation's Code of Ethics*, and meet periodically with the Corporation's General Counsel to discuss compliance with the Code of Ethics.

(Emphasis added.)

### Duties of the Nominating and Corporate Governance Committee

43.     Defendants Chehebar, Greene, and Mauer were members of the Nominating and Corporate Governance Committee (which was subsequently split

into the Nominating Committee and the Enterprise Risk Management Committee) during the relevant time period.

44.     The primary purposes of the Nominating and Corporate Governance Committee are:

> [T]o identify, and to recommend to the Board, individuals qualified to serve as directors of the Corporation, as the chief executive officer of the Corporation and on committees of the Board; to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Corporation; to oversee and approve the evaluation of the Board and the Corporation's management; and to lead the Board in its annual review of the Board's performance.

45.     The Nominating and Corporate Governance Committee's Charter states that the Committee has, among other duties, the responsibility:

- To review the suitability for continued service as a director of each Board member when his or her term expires and when he or she has a change in status, including but not limited to an employment change, and to recommend whether or not the director should be re-nominated.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

- To develop and recommend to the Board a set of corporate governance principles for the Corporation, which shall be consistent with any applicable laws, regulations and listing standards. At a minimum, the corporate governance principles developed and recommended by the Committee shall address the following:

(i)   Director qualification standards.

(ii)   Director responsibilities.

(iii)   Director access to management and, as necessary and appropriate, independent advisors.

(iv)   Director compensation, including principles for determining the form and amount of director compensation, and for reviewing those principles, as appropriate.

(v)   Director orientation and continuing education.

(vi)   Management succession, including policies and principles for the selection and performance review of the chief executive officer, as well as policies regarding succession in the event of an emergency or the retirement of the chief executive officer.

(vii)   Annual performance evaluation of the Board.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

- To consider any other corporate governance issues that arise from time to time and to develop appropriate recommendations for the Board.

- The Committee shall be responsible for overseeing the evaluation of the Board as a whole and management and shall evaluate and report to the Board on the performance and effectiveness of the Board. The Committee shall establish procedures to allow it to exercise this oversight function.

The Committee shall evaluate and recommend termination of membership of individual directors in accordance with the Board's corporate governance principles, for cause or for other appropriate reasons.

### Duties of the Compensation Committee

46.     Defendants Greene, Mauer, and Mayer were members of the Compensation Committee during the relevant time period.

47.     One of the primary purposes of the Compensation Committee is "to oversee the Corporation's compensation and employee benefit plans and practices, including its executive compensation plans and its incentive-compensation and equity-based plans."

48.     The Compensation Committee's Charter states that the Committee has, among other duties, the responsibility:

- To evaluate annually the performance of the Chief Executive Officer in light of the goals and objectives of the Corporation's executive compensation plans and to review and recommend the Chief Executive Officer's compensation level, including annual salary, bonus, equity grants, performance-related pay, perquisites or other personal benefits, retirement benefits, deferred compensation, tax gross-ups, supplemental executive retirement plans, severance payments, change-in-control agreements and all awards of shares or share options based on this evaluation for approval, either as a committee or together with the other Independent Directors. In determining the long-term incentive component of the Chief Executive Officer's compensation, the Committee shall consider all relevant factors, including the Corporation's performance and relative stockholder return, the value of similar awards to chief executive officers of comparable companies, and the awards given to the Chief Executive Officer of the Corporation in past

years. The Committee may discuss the Chief Executive Officer's compensation with the Board if it chooses to do so.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

50.      The Individual Defendants collectively and individually initiated a course of conduct that was designed to and did partially conceal and condone that Defendant Charney was consistently engaging in wrongful and illegal conduct and grossly mismanaging the Company, which negatively impacted American Apparel's finances, reputation and goodwill.

51.      The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state law, including breaches of fiduciary duty.

52.      The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or

recklessly failing to curb Charney's misconduct and letting him remain in a position of power at the Company where he could continue to engage in improper conduct and grossly mismanage the Company.  Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**A.    Corporate Background**

54.     American Apparel was founded by defendant Charney in 1998. On July 22, 2005, a "blank check" company named Endeavor Acquisition Corp. ("Endeavor") was formed under Delaware law to acquire an operating business. On December 12, 2007, Endeavor consummated the acquisition of American Apparel, Inc. and its affiliated companies, changing its name to American Apparel,

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Inc.  American Apparel commenced trading as a public company on December 12, 2007, on the New York Stock Exchange under the ticker symbol "APP."

55.     American Apparel is a vertically integrated manufacturer, distributor, and retailer of branded fashion basic apparel and accessories for women, men, children and babies, based in downtown Los Angeles, California.  Since inception, the Company has operated a wholesale business that supplies tee-shirts and other casual wear to distributors and the imprintable industry.   In October 2003, American Apparel opened its first retail store in Los Angeles.   In 2004, the Company began online retail operations, and opened its first retail stores in Canada and Europe.  Since 2005, American Apparel has opened stores in Asia, Australia, Israel, Latin America, and has further expanded throughout the United States, Canada, Europe, and Asia.   All of the Company's retail stores sell the Company's apparel products directly to consumers.  As of February 28, 2014, the Company had approximately 10,000 employees and operated 246 retail stores in 20 countries.   The Company also operates an e-commerce website with 12 different localized online stores in seven languages that serve customers from 30 countries worldwide.

56.     When American Apparel went public in 2007, Charney, the Company's founder, was named President and CEO, and was the majority shareholder.  The Company heavily publicized that its products were made in the

United States and was "sweatshop free," but American Apparel was forced to fire 1,800 skilled employees, more than half of its factory workers, after an immigration audit in 2009 uncovered questionable employment documents. Another thousand workers quit thereafter for fear of being caught in immigration raids. As a result of the severe disruption of the Company's manufacturing operations, shipments were delayed and the Company was forced to conduct an expensive hiring and training program to replace workers.

57.    Thereafter, the profits posted by American Apparel in its first years as a public company swiftly turned to losses. The Company lost a total of $270 million in fiscal years 2010-2013 and increasingly relied on borrowing to fund operations. American Apparel dramatically increased its debt load to approximately $250 million by the end of 2013. On lackluster performance, the price of American Apparel stock, which had traded at approximately $15 per share in December of 2007, plummeted to just over $0.50 per share early in 2014 and currently trades at approximately $0.70 per share.

**B.    Charney's Repeated Misconduct Leads to Multiple Lawsuits**

58.    For more than a decade, Charney has plagued American Apparel with improper conduct that has led to allegations, lawsuits, and official proceedings charging him with sexual harassment and other violations of law. The

necessity of terminating Charney to prevent the material damage he was causing to the Company was known to the Individual Defendants for years.

59.     Much of the details concerning these suits are not publicly available because American Apparel requires that its employees all sign mandatory agreements to submit their claims, including sexual harassment claims, to arbitration, which unlike regular court cases and jury trials are usually closed proceedings.  Some employees have been required to sign documents waiving their right to bring any claim against the Company at all.  The agreements further provide that the arbitration proceedings, including the outcomes and any settlements, were to be kept confidential.  Employees are also required to agree to not disparage Charney or the Company and cannot speak to any news media without prior approval.  The purposes of these agreements were to coerce potential complainants not to file a claim, no matter how well founded, since the Company could file an up to one million dollar counterclaim under the disparagement clause, and to ensure that the details of these suits would not become public.  The agreements enabled Charney and the Board to hide from the public and shareholders the full extent of Charney's misconduct and illegal activity.  Because of these tactics, Plaintiffs cannot specify exactly how many sexual harassment and other claims have been or could have been brought against Charney.  The available

information, however, reflects a series of heinous, improper and/or sexually harassing acts and conduct by Charney over the course of the last decade.

60.     For example, in 2004, during an interview with Claudine Ko, a reporter working on a profile that would run in the June/July 2004 edition of the magazine *Jane*, Charney's improper and shocking conduct was exhibited when he masturbated in front of Ko on "eight or so" occasions and on one occasion received oral sex from a female employee in Cho's presence.  Charney also admitted to having "wanted" a female employee in the Montreal office, stating in response to the question, "It never causes drama[?]," that "Damn right it does. You gotta be very careful – certain girls can handle it, certain can't. … I'm not saying I want to screw all the girls at work – I'm not a f—kin' madman.  But if I fall in love at work, it's going to be beautiful and sexual."

61.     In 2005, Mary Nelson, a former sales manager, brought a claim against Charney and the Company for sexual harassment and wrongful termination in Los Angeles County Superior Court, Case No. BC333028.  Nelson complained that Charney attended meetings in his underwear, exposed himself, and called women vulgar names.  In 2006, during a deposition for the case, Charney testified that he once hosted a meeting wearing nothing but a sock over his privates and would walk around the office in his underwear.  In response to the question of what Charney thought of the word "slut," he stated, "You know, there are some of

us that love sluts.  You know, it's not necessarily—it could be also be an endearing term."

62.     In 2008, Nelson, Charney and the Company entered into a settlement agreement, by which Nelson would be paid $1.3 million, subject to certain provisions, which included nondisclosure of the $1.3 million payment, an agreement to enter into an arbitration with an arbitrator selected and paid for by the Company with "foreordained facts and a predetermined award, which would be followed by the issuance of a misleading press release" that would state that the arbitrator had found Charney blameless.  The settlement agreement also contained an arbitration clause.  After counsel for Nelson refused to attend the sham arbitration, the Company and Charney requested that the court issue an order compelling arbitration concerning two alleged breaches of the settlement agreement by Nelson, namely Nelson's refusal to participate in the sham "arbitration" provided for in the settlement agreement and Nelson's purported violation of the confidentiality clause in the settlement agreement.  After the trial court denied the Company and Charney's request to compel arbitration concerning the settlement agreement, the Company and Charney appealed.

63.     On October 28, 2008, the Court of Appeal of the State of California, Second Appellate District, held in *Nelson v. American Apparel, Inc., et al.*, B205937, that the parties must arbitrate Nelson's purported breaches of the

agreement despite noting that the provisions of the settlement agreement had provided for a "deceptive procedure" that was "potentially illegal[]."  The court further stated that, "if this appeal involved a petition to compel the resumption of the 'arbitration'" of the underlying claims as provided for in the agreement, "[t]here would be considerations of illegality, injustice, and fraud which would affect our powers as a court of equity to enforce the 'arbitration' contemplated." Thereafter, the Company questionably stated that a settlement agreement was entered into with Nelson that purportedly did not provide her with any monetary compensation.  The *Nelson* action was reported in the Company's annual reports on Form 10-K filed with the SEC for fiscal years 2007 through 2011.  The Company's 10-Ks for fiscal years 2008 through 2011 were each signed by Defendants Charney and Mayer.  The Company's 10-Ks for fiscal years 2009 through 2011 were also signed by Defendant Greene.  The Company's 10-K for fiscal year 2011 was also signed by Defendants Chehebar, Danziger, Igelman and Mauer.

64.     As reported in the *Wall Street Journal* on April 12, 2008, American Apparel's insurer, Navigators Insurance Company, refused to pay any damages or legal fees related to a separate case pending in federal court in California in part because it asserted that the Company failed to fully disclose prior problems it had had with sexual harassment allegations.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

65.     In February 2006, Sylvia Hsu, a former American Apparel employee, filed a discrimination claim with the Los Angeles Equal Employment Opportunity Commission ("EEOC") alleging that she had been constructively discharged as a result of the sexual harassment and hostile work environment at American Apparel.   In March 2007, the EEOC expanded the scope of its investigation to include other employees who may have been sexually harassed.  In August 2010, the EEOC issued a determination that "*reasonable cause exists to believe [American Apparel] discriminated against Ms. Hsu and women, as a class, on the basis of their female gender, by subjecting them to sexual harassment*."  (Emphasis added.)  After this finding, in August 2013, the Company entered into a settlement with Hsu, agreeing to pay her an undisclosed amount.  In the settlement, the Company also agreed to "comply with our Policy on Sexual Harassment and Sexual Discrimination, which Policy was reviewed by the EEOC, and take certain administrative measures relating thereto."  The *Hsu* action was reported in the Company's annual reports on Form 10-K filed with the SEC for fiscal years 2007 through 2013.  The Company's 10-Ks for fiscal years 2008 through 2011 were each signed by Defendants Charney and Mayer.   The Company's 10-Ks for fiscal years 2009 through 2013 were also signed by Defendant Greene.  The Company's 10-Ks for fiscal years 2011-2013 were also signed by Defendants Chehebar, Danziger, Igelman and Mauer.

66.     In 2008, a lawsuit alleging hostile sexual behavior by Charney in the workplace was brought by Jeneleen Floyd, a former American Apparel employee, who alleged, among other things, that Charney demanded she "pretend to masturbate" in his presence.  Floyd was forced to arbitrate her claims.

67.     On September 20, 2010, an American Apparel shareholder filed an action in this District against the directors of the Company derivatively on behalf of American Apparel, captioned *In re American Apparel, Inc. Shareholder Derivative Litigation*, Case No. 10-cv-06576-MMM (RCx) (the "2010 Derivative Action").  Individual Defendants Charney, Greene and Mayer were also defendants in the 2010 Derivative Action.  That action alleged that the Company's board of directors breached their fiduciary duties to the Company and its public shareholders by failing to monitor American Apparel's internal financial controls and labor and employment practices, causing the Company to defend multiple lawsuits by former employees alleging that Charney sexually harassed them.  The sexual harassment actions cited in that action include multiple actions filed by former American Apparel employees in May 2005, including the case filed by Nelson, and the complaint filed by Ms. Hsu with the U.S. EEOC in 2006, cited *supra*. The 2010 Derivative Action further alleged that the directors' conduct caused the Company to violate federal immigration and securities laws, resulting in

the immigration audit by the U.S. Immigration and Customs Enforcement Agency in 2009, also cited *supra*.

68.   The 2010 Derivative Action was actively litigated in this District. On July 31, 2012, Judge Morrow granted defendants' motions to dismiss the action.  *See In Re American Apparel, Inc. Shareholder Derivative Litig*., Case No. 10-cv-06576-MMM (RCx), 2012 U.S. Dist. LEXIS 146970 (C.D. Cal. July 31, 2012).[1]  Plaintiffs appealed the dismissal, and the case is currently pending before the United States Court of Appeals for the Ninth Circuit, Case No. 12-57055.  As a result, all of the Individual Defendants have been directors of American Apparel during the pendency of the 2010 Derivative Action, and thus must be aware of the action and the allegations therein—particularly defendants Charney, Greene and Mayer, who are named defendants in that action.   Accordingly, the 2010 Derivative Action serves as an additional red flag to the Board of the negative implications to the Company flowing from Charney's repeated misconduct and mismanagement.

69.   Following the filing of the 2010 Derivative Action, the lawsuits against Charney continued.  In 2011, Irene Morales, a former American Apparel

---

[1]     Judge Morrow's dismissal of the 2010 Derivative Action was based, in part, on her finding that general allegations regarding Charney's "sexual proclivities" was insufficient to plead that the board failed to act, and the EEOC's determination issued in August 2010 that the Company discriminated against women as a class was "rather late in the relevant time period" and therefore insufficient to show that the directors acted in bad faith.  2012 U.S. Dist. LEXIS 146970 at *101-02.

employee, brought a suit against Charney in New York State court, alleging that Charney sexually harassed Morales for months, forced her to perform oral sex in his New York apartment in 2008, and made her his "sex slave."  In response, the Individual Defendants caused the Company to state that Morales sued only "after making a number of extortion-like threats to expose the company to a threatened avalanche of litigation and negative publicity."  Morales's suit was sent to private arbitration by the court at American Apparel's request.   As reported on Businessweek.com on July 9, 2014, an arbitrator dismissed those claims but found the Company "vicariously liable" for the conduct of another employee who had created a fake blog in Morales's name and posted erotic photos of Morales on it. The Businessweek.com article further stated that Charney had told some Board members and his lawyers that he had photos of Morales and of others accusing him of harassment, and that the Board members and lawyers did not object to Charney using the photos as part of his defense.  Businessweek.com further reported that the photos were sent to several newspapers and websites.  The Morales action was reported in the Company's 10-Ks for fiscal years 2011 through 2013 signed by Defendants Charney, Chehebar, Danziger, Greene, Igelman, Mauer, and Mayer.

70.     Also, on March 23, 2011, Kimbra Lo, Alyssa Ferguson, Marissa Wilson, and Tesa Lubans-Dehaven, former American Apparel employees, filed a lawsuit in Los Angeles County Superior Court, Case No. BC457920, against

Charney and the Company alleging sexual harassment.  The complaint alleged that Charney sent "sexual text messages" to Lo in July 2010 and masturbated during a phone call with Lo.  The suit further alleged that Lo ignored Charney's calls and text messages until December 2010, when Charney offered her a modeling and photography job.  When Lo arrived at Charney's apartment to discuss the position, Charney, who was wearing only a towel, allegedly "violently kissed her" and forced her to perform sexual acts.  In response to this lawsuit, the Company was caused by the Individual Defendants to assert that the women were colluding to "shake down" Charney and the Company for money and that it had "voluminous evidence" that purportedly showed the allegations to be false.  Indeed, during an interview with the *Los Angeles Times* after news of this lawsuit surfaced, Charney showed reporters sexually explicit emails and text messages that purportedly had been sent by some of the plaintiffs, in which the women asked Charney to pay for airfares and provide them with money, as well as nude photos of the women in suggestive poses.  One such photo included Charney.  All of the claims in that suit were either settled or dismissed.  This action was reported in the Company's 10-Ks for fiscal years 2011 through 2013 signed by Defendants Charney, Chehebar, Danziger, Greene, Igelman, Mauer, and Mayer.

71.    On April 26, 2011, three former American Apparel employees filed a lawsuit against American Apparel, Charney and a Company employee in

Los Angeles Superior Court, Case No. BC460331, asserting claims for impersonation through the internet, defamation, invasion of privacy and other claims, which was ordered into arbitration. The action was reported in the Company's 10-Ks for fiscal years 2011 through 2013 signed by Defendants Charney, Chehebar, Danziger, Greene, Igelman, Mauer and Mayer.

72. On November 29, 2012, Michael Bumblis ("Bumblis"), a former American Apparel store manager, filed a lawsuit claiming that Charney called him racial and homophobic slurs, choked him, and rubbed dirt in his face because Charney was unhappy with the store's condition. The lawsuit, captioned *Bumblis v. American Apparel Retail, Inc., et al.*, Case No. BC496498, was filed in Los Angeles County Superior Court. Bumblis's attorney has informed the Company that there is video evidence of Charney's alleged behavior. On May 24, 2013, Judge Steven Kleifield ruled that Bumblis's arbitration agreement with the Company was invalid and unenforceable because Bumblis could be liable for up to $1 million under the confidentiality and non-disparagement clause in the agreement. The Company has appealed the trial court's denial of the motion to compel arbitration. The public docket for that appeal reflects that American Apparel's attorney has filed a motion to withdraw and that the court has received a notice of settlement.

73.     The Los Angeles County Superior Court's ruling that the arbitration agreement was invalid and unenforceable will embolden future employees to similarly challenge their arbitration agreements, especially in the event that the trial court's ruling in the *Bumblis* matter is affirmed by the appellate court before that action is dismissed due to the settlement.  Accordingly, American Apparel will likely face additional lawsuits that will not be shielded by the Company's onerous arbitration agreement and confidentiality provisions.

74.     For years, the Individual Defendants condoned these repeated instances of egregious misconduct.  Indeed, Defendant Mayer has been quoted by *The New York Times* as stating, in reference to the Board finally taking action to terminate Charney, as detailed *infra*, that, "We were well aware when we did this that the first question most people would ask was, 'What took you so long.' … We were not blind and deaf to all of the allegations and the newspaper stories[, b]ut you can't take an action this serious simply on the basis of rumors and allegations." Mayer further told *The Post* that, "We have heard for years allegations and rumors in newspaper stories that were not sufficient to take action.  But what came to our attention was not allegations and rumors but established fact."  Clearly, however, these instances rose beyond mere "rumors and allegations."  Beyond the fact that the bevy of lawsuits cost the Company millions of dollars in fees for settlements and attorneys' fees, there were enough facts developed in these cases to evidence

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Charney's pattern of misconduct.  Clearly, as revealed by the original settlement agreement entered into with Nelson, the Company and Charney took advantage of the arbitration agreements with its employees and entered into possible sham and/or illegal settlement agreements with employees for years.   Indeed, the EEOC's 2010 determination that "reasonable cause exists to believe [American Apparel] discriminated against Ms. Hsu and women, as a class, on the basis of their female gender, by subjecting them to sexual harassment" was not simply rumor or allegation, but an *official finding* of a government agency.

75.   Moreover, Charney's actions and the onslaught of lawsuits against him negatively affected American Apparel's ability to raise finances.   Lenders were hesitant to work with American Apparel, and many refused to extend the Company credit at all.   Those who would work with American Apparel, would only agree to extend financing at exorbitantly high interest rates.   Moreover, the Company could not obtain insurance at reasonable premiums.

76.   The Board was aware of the foregoing lawsuits and allegations against Charney, but turned a blind eye to his illegal and continuing misconduct for more than a decade.   As a result, the Company was forced to spend millions to defend multiple lawsuits and settle certain of the actions.   The Company is also exposed to additional liability arising from American Apparel's onerous arbitration agreement and confidentiality provision.   Moreover, the Individual Defendants

maintained the Company's arbitration agreement and confidentiality provision despite at least one judge ruling that the confidentiality provision is unconscionable and the arbitration agreement is unenforceable.

## C. The Individual Defendants Allowed American Apparel To Be Mismanaged

77.     In addition to the multiple sexual harassment and discrimination lawsuits detailed above, American Apparel has suffered crippling financial, operational and personnel problems for several years due to Charney's systemic misconduct and mismanagement of the Company.  The Board turned a blind eye to Charney's glaring failures as CEO over several years as the Company's financial condition deteriorated and its stock price plummeted from $15.00 per share in 2007 to a low of $0.47 per share in early 2014.  As reported in the *Los Angeles Times* on March 18, 2014, the Company nearly lost its listing on the New York Stock Exchange ("NYSE") in early 2014.

78.     From its inception as a public company, American Apparel lacked sufficient internal controls over operations and financial reporting.  As reported by the *Wall Street Journal* on April 12, 2008, American Apparel went public through its acquisition by a special purpose acquisition company because the Company could not stand the accounting scrutiny required of the initial public offering process.  Those problems persisted after the Company began trading publicly.  For example, on March 31, 2010, American Apparel announced that its auditor,

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Deloitte & Touche LLP ("Deloitte"), had identified material weaknesses in the Company's internal controls over financial reporting.  On July 28, 2010, American Apparel announced that Deloitte had resigned and that the Company's financial statements for fiscal 2009 may not be reliable.  Thereafter, American Apparel issued four amendments to its annual report for fiscal year 2009, including admissions that its internal financial controls were inadequate, and also revising guidance for future financial results downward.

79.     The lack of internal controls and mismanagement by Charney has severely damaged the Company.  In 2007, American Apparel posted net income of over $15 million.  Thereafter, the Company's net income fell to $1.1 million in fiscal year 2009, the last year that American Apparel reported a profit.  American Apparel's financial condition continued to deteriorate as the Company's initial profits turned to four straight years of net losses in fiscal years 2010 through 2013. In fiscal year 2013, the Company reported a net loss of $106.3 million.

80.     As American Apparel's losses mounted, the Company was increasingly dependent upon borrowing to sustain its operations.  American Apparel has been forced to pay interest rates of up to 20% to borrow money during a period of historically low interest rates, according to the *Wall Street Journal*. Some financial companies have even refused to lend the Company money at any interest rate, as reported by *Slate*.

81.      Moreover, as reported by the *Wall Street Journal* and *The New York Times*, Charney's erratic management caused a severe shortage of qualified personnel, especially senior personnel and executives, at American Apparel. Charney's mismanagement and misconduct made it extremely difficult for American Apparel to attract and retain qualified people.  As American Apparel grew, Charney continued to micromanage all aspects of the Company's operations and alienate talented personnel.

82.      Indeed, as reported by the *Wall Street Journal* on April 12, 2008, Charney said in an interview on March 20, 2008, that the Company's then-Chief Financial Officer, Ken Cieply ("Cieply"), "had no credibility in the retail apparel industry" and was "a complete loser."  Charney later withdrew the remark, but Cieply left the Company.

83.      Likewise, in March of 2011, at the suggestion of Lion Capital LLP ("Lion Capital"), one of the Company's lenders, the Company hired Marty Staff ("Staff") as Chief Business Development Officer.   Staff is a highly experienced executive with nearly forty years of experience in senior management at leading fashion companies, including successful tenures as CEO of JA Apparel Corporation and Hugo Boss, and executive positions at Polo Ralph Lauren and Calvin Klein.  However, Charney refused to cede any operating control to Staff, who left American Apparel after approximately six months as a result.  Staff stated

to *Women's Wear Daily* after his departure from the Company that "Dov is a one-man band. . . . When I joined, I don't think I realized how actively Dov manages every part of the company – from design to IT to marketing to finance.  All roads lead through Dov."   As one commentator stated in a report published on Forbes.com on July 28, 2014, "Charney just continued to micromanage every part of the business. . . .  This is not unlike the turnover of many other capable operating executives who wouldn't put up with the tumultuous and chaotic working environment where it was impossible for them to develop and implement sound strategies for achieving growth."

84.     Indeed, even Board members resigned from the Company due to Charney's conduct.  On May 2, 2011, Keith Miller, a member of the Company's Board, Audit Committee and Chairman of the Compensation Committee resigned due in part to the "erosion" Charney's conduct had caused the Company's shareholders.   Thereafter, on July 1, 2011, Audit Committee members Mark Samson and Mark Thornton also resigned from the Company.

85.     As a result of Charney's mismanagement, the Company's employees have had to perform important tasks for which they were entirely unqualified.  Indeed, at one point, the General Counsel of American Apparel was personally managing the company's fleet of stores.  At another point, there was

only one attorney employed by the Company, which has 246 stores and 10,000 employees.

86.     Charney, himself, was also performing inappropriate tasks for his position.  For a time in 2013, Charney personally signed all of the checks by which the Company paid its bills, causing a massive backlog.  Even with this personnel shortage, in 2013, Charney chose to fire many people in the finance, production, fabric receiving, and legal departments, including the Company's General Counsel, Glenn Weinman.  He spent a period of time in 2013 personally supervising the completion of the Company's distribution center in La Mirada, California, that was plagued by software problems, construction delays, and insufficient training that hampered operations.  Charney moved into the La Mirada facility in August of 2013, and involved himself in every aspect of the operation, including the loading of trucks.  According to a report published on Businessweek.com on July 9, 2014, the problems at the La Mirada facility cost the Company at least $15 million.

87.     According to the same Businessweek.com article, Defendants Greene and Mayer discussed the lack of qualified senior executives with Charney in February 2014.  Thus it is clear that Defendants Greene and Mayer were well aware of the deep managerial and operational dysfunctions at the Company, but, along with the other Individual Defendants, took no action to remedy the problems.

88.     Moreover, Charney's improper behavior, mismanagement, and the ongoing lawsuits against Charney and the Company have not been ignored by analysts following the Company, who have identified Charney's misconduct as negatively impacting the value of and prospects for the Company.  For example, on July 8, 2008, *Ladenburg Thalman* noted that:

> The company is grappling with accounting issues and recently hired an interim CFO to help address these problems.  We feel though that the uncertainty surrounding the identification of a permanent CFO continues to depress the share's valuation.   Furthermore, there was news that at the end of May another lawsuit was filed against the company and CEO on the grounds of employment discrimination …
> Taking into consideration the uncertainty regarding the permanent CFO and the continuing ***legal saga***, we believe ***the shares should trade at a discount to the peer group*** and are reducing our price target from $10.50 to $8.00.

(Emphasis added.)

89.     In a Company note dated January 6, 2009, *KeyBanc* analyst Edward Yruma noted that:

> Litigation is extensive and ongoing. As discussed later in this report, the Company has a number of pending lawsuits.  By our count, the

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Company has at least five cases of sexual harassment that are in progress or have been settled.  We think that the stock will remain under pressure until resolution is achieved on pending litigation matters.  Moreover, many of the claims relate to sexual harassment, which may be an unintentional byproduct of a provocative, and unconventional, workplace environment … In an interview cited by the Wall Street Journal in April 2008, Mr. Charney made a number of denigrating comments about Mr. Cieply.  While he later retracted his comments, we still find the public airing of them as bizarre, to say the least.

90.      On June 25, 2010, *KeyBanc Capital Markets* noted that the main risks to the Company included "the Company's ongoing refinancing issues, and ***key man risk around CEO Dov Charney***."  (Emphasis added.)

91.      In June 2011, *Disclosure Insight* highlighted that there are: [Two] ongoing DOJ investigations.  In the first investigation, APP disclosed that it received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York in Jul-10 for documents relating to the circumstances surrounding the change in auditors.  In Aug-10, the company also received a subpoena from the U.S. Attorney's Office for the Central District of California for

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

documents relating to an official criminal investigation being conducted by the FBI into the change in the company's registered independent accounting firm and the company's financial reporting and internal controls.  The subpoena issued by the U.S. Attorney's Office for the Central District of California had been stayed pending the company's response to the SEC subpoena.  The matter is ongoing as of May-11.  In the second investigation, APP received a subpoena on 9-May-11 from the U.S. Attorney's Office for the Central District of California for documents relating to a complaint filed by a former employee with the Occupational Safety & Health Administration in Nov-10.

92.     On August 30, 2012, *Roth Capital* noted that:

APP currently has several lawsuits against it, including a consolidated putative shareholder class action, two consolidated shareholder derivative actions, five wage and hour suits and numerous employment related claims and suits.  The company is also responding to several allegations of discrimination and/or harassment that have been filed with the Equal Employment Opportunity Commission or state counterpart agencies.  If one or more of these

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

matters are decided against APP, *we believe the company could incur a substantial liability as well as reputational harm*.

(Emphasis added.)

93.　　In a Company note dated July 9, 2013, *Roth Capital Partners* stated that "[g]iven its ongoing turnaround, American Apparel is highly-dependent on the efforts of senior management. *The departure of key members of this management team could negatively affect results*." (Emphasis added.)

94.　　Clearly, the Individual Defendants have long known and chosen to ignore these and other problems with American Apparel's operations, finances, management and personnel. The Individual Defendants knew that Charney's mismanagement of the Company was causing American Apparel's financial condition to steadily deteriorate, the price of the Company's stock to fall precipitously, the Company's cost of borrowing money to astronomically escalate, senior management personnel to leave, and senior management positions to remain unfilled. These factors, individually and in combination, affected the Company's core operations over many years and were unmistakable red flags that should have caused the Board to investigate Charney's management of the Company, and, based on that investigation, take action to the benefit of American Apparel and its shareholders. Indeed, even the prudent determination to hire Staff was initiated by Lion Capital, not the Individual Defendants. By allowing Charney to continue in

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

his gross mismanagement as the Company's top executive, and ignoring the negative impact thereof, the Board shares with Charney the blame for the damage described herein to the Company's operations, financial position and reputation.

**D. The Board Finally Takes Action Against Charney**

95. It was only after the Company's financial situation had grown precarious – the Company's interest rates on some loans had shot up to as high as 20%, the Company posted a loss of $106 million in 2013, and the price of American Apparel's stock had plummeted to a low of $0.47 per share in March 2014 – that the Board finally decided to take action against Charney by initiating an investigation.

96. On June 18, 2014, the Company held its Annual Meeting of Stockholders, during which Defendants Danziger, Greene and Mayer were re-elected to the Board.

97. Later that same day, the Board offered to Charney that, if he resigned from the Board and as CEO, he would be retained as a consultant for four years at an annual salary of $1 million. At the end of that time, he would receive a severance package and cease all roles at the Company. The Board gave Charney only nine hours to respond. It was only after Charney rejected this offer that the Board took steps to terminate Charney's director and officer positions with the Company. The Board then voted to terminate Charney, and the Company issued a

press release entitled, "American Apparel Board Suspends Dov Charney as CEO and Declares Intent to Terminate Him for Cause; Names John Luttrell as Interim CEO." The press release stated that:

> The Board of Directors of American Apparel, Inc. (NYSE MKT: APP) today voted to replace Dov Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause. It is expected that the termination will be effective following a 30-day cure period required under the terms of Mr. Charney's employment agreement.
>
> The Board suspended Mr. Charney from his positions as President and CEO, effective immediately, pending the expiration of the cure period. At the same time, the Board appointed John Luttrell as Interim Chief Executive Officer. Mr. Luttrell, who has been with American Apparel since February 2011 and currently serves as Executive Vice President and Chief Financial Officer, will continue in those positions as well. Prior to joining American Apparel, Mr. Luttrell served as Executive Vice President and Chief Financial Officer of Old Navy, The Wet Seal and Cost Plus.
>
> Also effective immediately, the Board appointed Allan Mayer and David Danziger as Co-Chairmen to replace Mr. Charney as

Chairman of the Board.   In accordance with the terms of his employment agreement, the Board intends to request Mr. Charney's resignation as a member of the Board concurrently with the effective time of his termination.

Mr. Mayer, who has been a member of the Board since the company went public in 2007 and has served as its lead independent director for the past three years, said the Board's decision to replace Mr. Charney grew out of an ongoing investigation into alleged misconduct.

"We take no joy in this, but the Board felt it was the right thing to do," Mr. Mayer said.  "Dov Charney created American Apparel, but the Company has grown much larger than any one individual and we are confident that its greatest days are still ahead." …

As a result of the management changes, the Company may have been deemed to have triggered an event of default under its credit agreements and will be in discussions with its lenders for a waiver of the default.

98.     The Company filed an 8-K with the SEC the next day, providing more details concerning the termination of Defendant Charney and its implications for the Company's finances.  The 8-K stated, in pertinent part, that:

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

In connection with the suspension of Dov Charney as Chief Executive Officer of American Apparel, Inc. (the "Company") described under Item 5.02 below, the Company may be deemed to have triggered an event of default under the Credit Agreement, dated as of May 22, 2013, among the Company and Lion/Hollywood L.L.C. (the "Lion Facility").  Under the terms of the Lion Facility, in the event that Mr. Charney ceases to be the Company's Chief Executive Officer, an event of default occurs and the lenders may declare outstanding obligations to be immediately due and payable.  An event of default under the Lion Facility would also trigger an event of default under the Credit Agreement, dated as of April 4, 2013, among the Company and Capital One Business Credit Corp. (the "Capital One Facility"). We are in the process of notifying Lion and Capital One of Mr. Charney's suspension and are seeking a waiver of such event of default.  There can be no assurance that that the requested relief will be granted on terms acceptable to us or at all.  Unless we are able to secure a waiver, the lenders under the Lion Facility and the Capital One Facility are entitled to, among other things, accelerate the outstanding amounts under the facility.  Any such acceleration under our credit facilities would have a material adverse effect on our

liquidity, financial condition and results of operations, and could cause us to become bankrupt or insolvent.

99.     Neither the press release nor the 8-K filed with the SEC revealed the specific details of the reason why Defendant Charney was being terminated "for cause." However, a news source obtained a purported copy of the termination letter that the Board sent to Defendant Charney, outlining that he was being terminated for breaching his fiduciary duty, violating company policy, and misusing corporate assets. According to the news outlet *BuzzFeed*, the letter sent on behalf of the Board to Defendant Charney stated:

> Dear Mr. Charney:
>
> Pursuant to Section 7(a) of your Employment Agreement dated April 1, 2012 (the "Employment Agreement"), the Board of Directors of American Apparel, Inc. (the "Company") hereby provides notice that (i) you have willfully and continuously failed to substantially perform your job duties under the Employment Agreement and (ii) you have engaged in willful misconduct that has materially injured the financial condition and business reputation of the Company. Based on your failures and misconduct, the Board intends to terminate your employment with the Company for cause effective July 19, 2014

unless you are able to fully effect a cure in accordance with the terms of the Employment Agreement.

The Board's investigation of your misconduct is ongoing and has been hindered by the fact that certain information has not been made available to the Board.  However, to date, the events and circumstances by which you failed to perform your job duties and the details of your willful misconduct include the following:

1.    <u>Breach of Fiduciary Duty</u>. As an officer and director of American Apparel, you owe fiduciary duties to the Company.  Among other things, your fiduciary obligations require you to act in the best interests of the Company, to act in good faith and to refrain from conduct that amounts to self dealing or presents a conflict of interest. You have violated the fiduciary obligations owed to the Company in several material ways.  For example, you were aware of, but took no steps to prevent an employee under your direct supervision and control from creating and maintaining false, defamatory and impersonating blog posts about former American Apparel employees.  You were in a position to prevent this conduct from occurring but, since it benefitted you personally, you allowed it to continue.  Your failure to act was not in the best Interest of the Company. It exposed the Company to

liability and at least in once instance, directly resulted in an arbitrator finding that the Company acted with malice. Your failure to act also directly resulted in one arbitrator finding that the Company was vicariously liable for the conduct of your subordinate. Those findings, in turn, exposed the Company to a significant punitive damages award. You engaged in similar misconduct with respect to several other former American Apparel employees, resulting in material payments and probable future settlements of such claims.

We also recently learned that you presented significant severance packages to numerous former employees (including packages to [REDACTED]) to ensure that your misconduct vis-a-vis these employees would not subject you to personal liability. None of these severance packages were discussed with or approved by the Board of Directors. These severance packages were material expenditures of Company funds that were not in the best interests of the Company and instead were to protect you from personal liability for misconduct. Moreover, we were recently appraised that you engaged in misconduct - including the potential subordination of perjury - in a pending litigation matter and that your misconduct will undermine the Company's position in that case.

2.   <u>Violation of Company Policy</u>.  You have violated numerous Company policies and have failed to take action to enforce the Company's policies in derogation of your obligations as Chief Executive Officer.  As is evident from a number of recent court rulings and arbitrator awards and decisions, you repeatedly engaged in conduct that violated the Company's sexual harassment and anti-discrimination policy.  Furthermore, you engaged in conduct that repeatedly put yourself in a position to be sued by numerous former employees for claims that include harassment, discrimination and assault.

In the recent past, you refused to participate in mandatory sexual harassment training and undermined the Company's policies by interrupting employee sexual harassment training mandated under California law.  By engaging in such conduct, you violated the Company's Code of Ethics which, among other things, requires you to deter wrongdoing and promote compliance with applicable law, rules and regulations.  You also violated the Code of Ethics by failing to stop your subordinate from posting false and defamatory blogs as discussed above.  Furthermore, on several occasions you have made derogatory and disparaging remarks directed at persons

of certain ethnicities or related to their gender, sexual orientation or religious persuasions that are discriminatory and offensive and are not in accordance with Company policies.

3.    Misuse of Corporate Assets. You have used corporate assets in an inappropriate manner and for personal, non-business reasons without approval of the Board.  For example, you continue to seek reimbursement by the Company for personal services such as legal consultation and certain property rentals and related expenses for various employees/consultants.   The Board has reason to believe that many of these expenses were not legitimately incurred to advance the interests of the Company.  These funds were instead used for personal reasons and to advance your personal objectives. Additionally, you have used Company assets to make substantial severance payments to protect you from personal liability.  You have provided to employees various salary increases, bonuses, and commission payments that were not meant to reward exemplary performance or further the Company's interests.   Instead, you authorized these payments to induce employees to sign release agreements that were aimed at protecting you from personal liability for your misconduct.  These payments, like the severance payments

discussed above, were incurred for personal reasons and not to advance the legitimate business interests of the Company. You also have engaged in self dealing by purchasing travel for family members with Company funds. These self-dealing transactions were not approved by the Board.

Your misconduct has injured the Company's financial condition and business reputation.  In terms of finances, your conduct has required the Company to incur significant and unwarranted expenses, including expenses associated with litigation and defense costs, significant settlement payments, substantial severance packages that were granted to employees, and unwarranted business expenses that you incurred for personal reasons.  The Company's employment practices liability insurance retention has grown to $1 million from $350,000, causing an unacceptable level of risk for the Company, and the premiums for this insurance are well outside of industry standards. These risks and costs to the Company are a direct result of your actions.  The resources American Apparel had to dedicate to defend the numerous lawsuits resulting from your conduct, and the loss of critical,

qualified Company employees as a result of your misconduct are also costs that cannot be overlooked.

Your misconduct has also harmed the business reputation of the Company.  This is illustrated by voluminous press reports describing your behavior and the fact that the Company has had a very difficult time raising capital and securing debt financing at reasonable rates because of your actions.  Indeed, many financing sources have refused to become involved with American Apparel as long as you remain involved with the Company.  When the Company has been able to secure financing, it has been required to pay a significant premium for that financing in significant part because of your conduct.

Based on the events and circumstances detailed above, you are hereby suspended and placed on administrative leave <u>effective today, June 18, 2014</u>. Your suspension and administrative leave will last until July 19, 2014 or until such earlier time as you are able to fully effect a cure of your misconduct.  On July 19, 2014 we will inform you of our final decision concerning your employment status.

Effective immediately, you will be relieved of all of your job duties and obligations, including as President and Chief Executive Officer; your power to act on the Company's behalf is hereby

suspended.  During your suspension, you shall not, on behalf of the Company, negotiate or enter into contracts, disburse funds, make any statements on the Company's behalf to the press, public or vendors (or induce, condone or fail to prevent others from making such statements), attempt to communicate with current employees or former employees with continuing contractual obligations to the Company (including under severance arrangements), or disrupt or interfere in any way with the Company's operations.  You remain subject to and must continue to abide by the Company's policies, including the Company's confidentiality and non-disparagement policy.  You also remain subject to continuing obligations under federal securities laws (including the prohibition against unauthorized disclosure of, or trading while in possession of, material non-public information) and continuing fiduciary duties under state law.  During your suspension, you are not permitted to access directly or indirectly the Company's computer systems or flies, use any of the Company's assets, or interact with any of the Company's employees or former employees with continuing contractual obligations to the Company, visit the Company's facilities (including but not limited to its manufacturing facilities, headquarters, distribution center, apartments and stores), or contact

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

vendors or landlords, unless you obtain advance written permission from the Board of Directors and your request is tied directly to an attempt to cure the violations and misconduct described herein.  If you violate the directives outlined in this paragraph, the Board will consider such conduct an additional "cause" to terminate your employment. During your suspension, you will continue to receive your monthly salary and the other benefits required to be paid under your Employment Agreement.

The Board is continuing to investigate the scope and extent of your misconduct.  The Board reserves the right to notify you of additional events and circumstances that constitute cause to terminate your employment. The Board also reserves the right to supplement and amend this notice as additional information is learned through the course of its ongoing investigation into your actions.

100.    The article reprinting the contents of the termination letter further stated that, while the Board told *BuzzFeed* "that it learned of new information this spring that spurred an investigation, ultimately resulting in its decision to oust Charney," a source told *BuzzFeed* that "the board has known about the allegations set forth in the letter for some time, and that it's calling attention to them now because American Apparel's finances have deteriorated so significantly."

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

101.     One of the instances of wrongdoing referenced in the termination letter related to the sexual harassment suit brought in 2011 by Morales, described *supra*.  In this case, an arbitrator found Charney guilty of defamation for failing to stop the publication of naked photographs of Morales on a blog that purportedly was created and authored by her.  Morales claimed that the blog posts defamed and harassed her and violated California laws that prohibit falsely impersonating someone online.  The Company reportedly had to pay Morales $1 million for defamation and violation of California law.

102.     But this was not the first time Charney used purported sexually explicit photos in an improper attempt to discredit his accusers.  In fact, as noted *supra*, on March 25, 2011, the *Los Angeles Times* reported that during an interview with Charney after a sexual harassment lawsuit had been filed by four former employees, he showed reporters sexually explicit photos of the women posing suggestively in the nude, and one photo that featured Charney himself.

103.     The Individual Defendants have long known of, and ignored, these and other problems with the Company's operations, finances, management, and personnel.  In fact, Defendant Mayer, who was named as Co-Chairman of American Apparel after Charney was suspended, was quoted in an article published in the *New Yorker* on June 26, 2014 as saying that the Company's Board

"was 'painfully aware' of the sexual harassment lawsuits and the newspaper stories" detailing Charney's misconduct.

104.     By condoning Charney's misconduct, the Individual Defendants permitted the damage described herein to the Company's operations, financial position and reputation.  Even more egregious is that, even while faced with the litany of improper and illegal conduct outlined in the termination letter, the Individual Defendants first offered Charney a four-year consulting job with the Company, paying $1 million per year, comparable to his 2013 compensation.  It was only after Charney refused the offer that the Board terminated him.

**E.** **The Fall-Out From Charney's Ouster**

105.     Charney immediately fought back against his ouster.  On June 19, 2014, the day after the Board suspended him, Charney's attorneys wrote a letter to the Company's counsel stating that most of the Board's charges involved activities "about which the Board and the Company have had knowledge for years." Charney's counsel also asserted that by giving Charney only nine hours to respond to the Board's demand that he voluntarily resign, the Board violated Charney's right to confer with counsel and his rights pursuant to the Age Discrimination in Employment Act, which requires twenty-one days to consider any proposed severance agreement.  Charney's counsel further charged that the proposed separation agreement delivered to Charney falsely stated that he was granted

twenty-one days to consider whether to sign it.  Thus, through the process followed by the Board in suspending Charney, Charney gained a possible defense to his suspension, and leverage against the Board.  Charney has filed an arbitration petition against the Company alleging wrongful termination and retaliation.

106.    Due to recent additional stock offerings made by American Apparel, at the time Charney received the termination letter from the Board, his stock ownership had been reduced from a majority stake to 27% of the Company's outstanding stock.  After his ouster, Charney began approaching possible partners to assist him in boosting his stake in the Company.  Standard, another of the Company's largest shareholders, agreed to assist Charney.

107.    As revealed through a Schedule 13D filing with the SEC, on June 25, 2014, Charney entered into an agreement with Standard that provided that if Standard acquired at least 10% of the Company's outstanding shares, it would lend Charney the funds to buy the stock.  In return, in addition to paying interest, Charney agreed that his American Apparel shares would only be voted as agreed to between Charney and Standard, with Charney being allowed to vote the shares in favor of his election to the Board.

108.    Also on June 27, 2014, Charney, using his purported authority as CEO, sent a letter to the Board calling a special meeting of the stockholders to be held in September 2014.  At the meeting, Charney wanted the shareholders to vote

on, among other things, amending the Bylaws of the Company to increase the number of Board members to 15 and electing individuals to fill any of the vacancies created by the increase in the Board.

109.    On June 28, 2014, after Charney had purchased the additional stock, the Board announced that it had adopted a one-year stockholder rights plan, or "poison pill," aimed at preventing Charney from amassing more shares and attempting to take control of the Company.  However, on June 30, 2014, Charney disclosed that he had acquired an additional 27.4 million shares of American Apparel stock before the poison pill was implemented, increasing his holdings from 27% to approximately 43% of the Company's outstanding shares as of June 27, 2014, close to the critical 50% benchmark at which he could accomplish his reinstatement.    Rather than adopt the poison pill as soon as Charney was suspended, the Board failed to timely act to block Charney's acquisition of a significant additional stake in the Company and so enabled his attempt to regain control of the Company to it and its shareholders detriment.

110.    The Board caused further damage to American Apparel by failing to ensure that Charney's suspension did not trigger defaults on the Company's loans, including a payment acceleration of its credit agreement with Lion Capital, or an event of default on the Company's $50 million credit line with Capital One Business Credit Corporation ("Capital One").  According to *Bloomberg News*,

American Apparel has a $10 million loan with Lion Capital, the terms of which include acceleration of the loan repayment in the event of a change in management.  The Board failed to obtain a waiver of that term from Lion Capital before the Board met with Charney on June 18, 2014, thereby risking the potential insolvency or bankruptcy of the Company.

111.    Moreover, the Board knew or should have known that Lion Capital would likely be unwilling to waive the term, in light of the fact that Lyndon Lea, one of Lion Capital's partners and a former Lion Capital-designated member of the Company's Board, who resigned to eliminate "conflicts of interest," was friendly with Charney.

112.    Indeed, according to an article published by the *Financial Times* on June 26, 2014, Lion Capital demanded repayment of a $10 million loan made to American Apparel by July 4, 2014, claiming that the Company's termination of Charney put it in default on that loan.  The Company argued that Charney was still technically CEO and, therefore, no default had yet occurred, as the 30-day period after the termination letter was sent would expire on July 19, 2014, at which point Charney's termination would be effective.

113.    Moreover, as revealed in the 8-K the Company filed with the SEC after Charney's termination, an event of default under the Lion Facility would also trigger an event of default for the Company's $50 million credit line (under which

$30 million was drawn) with Capital One, due to a cross-default provision.  A default on the Capital One credit line would result in the Company losing access to $20 million available to American Apparel under that agreement.  While the Board did apply for a waiver from Lion Capital, which would have stopped the acceleration of the loan repayment, it did not wait for the approval of the waiver before beginning the process of terminating Charney and, since the waiver was denied, the Company was required to make the accelerated payment to Lion Capital or default on the Capital One line of credit.  The Board knew or, in order to be fully informed, was required to know of these provisions.  The Board had ample opportunity to work out a satisfactory arrangement to avoid default in the three months during which they conducted their purported investigation into Charney.  By failing to do so before taking steps to terminate Charney, the Board exposed the Company to the catastrophic prospect of insolvency or bankruptcy.

114.     By condoning the egregious misconduct of American Apparel's top executive over a period of several years as the Company's financial condition and stock price steadily deteriorated, by failing to ensure that American Apparel would not default on its loans before suspending Charney, and by failing to take defensive measures before Charney increased his stake in the Company, the Board breached their fiduciary duties and caused substantial damage to the Company.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Moreover, the process followed by the Board provided Charney with a potential defense to termination, and leverage to further his efforts to be reinstated.

**F.    The Individual Defendants Enter Into the Support Agreement**

115.    Under pressure from Charney trying to take over the Company and Lion Capital threatening the Company's financial future—and despite the fact that just days after the Board sent Charney the termination letter, on June 20, 2014, a video was released online showing Charney dancing nude in the presence of two alleged female employees—the day after receiving Lion Capital's notice of default the Board agreed to make a deal with Charney and Standard.

116.    On July 9, 2014, the Company filed an 8-K with the SEC announcing the "Support Agreement" with Standard and Charney.  The Support Agreement provided that Standard would not acquire any additional shares of the Company's stock nor call any special meetings of the Company's stockholders. Standard further agreed to provide the Company with up to $25 million, in order to allow the Company to pay off the Lion Facility.  In an 8-K filing with the SEC on July 18, 2014, it was revealed that, as of July 16, 2014, Lion Capital had assigned the Lion Facility to Standard.

117.    The Support Agreement also provided that five of the seven then-current Board members would "resign effective ten (10) days following the Company's filing of an Information Statement" with the SEC.  Only Defendants

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Mayer and Danziger would remain as members of the Board.  Mayer—who has served on the Board since December 2007 and ignored Charney's wrongdoing for six and one half years—and Danziger—who has served on the Board since June 2011, chaired the Audit Committee during the relevant time period, and ignored Charney's wrongdoing for three years—would remain as Co-Chairman of the Board.  In order to fill the Board vacancies, Standard would appoint three new members of the Board, and Standard and the Company would agree on the other two new Board appointees.  Charney agreed to not seek a Board seat.

118.    The Support Agreement further provided that after the board is reconstituted, a new committee would be constituted to "oversee the continuing investigation" into Charney's alleged misconduct (the "Suitability Committee"). The Suitability Committee would be comprised of Defendant Danziger, one Standard designee and one joint designee.  The 8-K filed with the SEC stated that:

> Based on the findings of such Investigation, the Suitability Committee will determine if it is appropriate for Mr. Charney to be reinstated as CEO of the Company or serve as any officer or employee of the Company or any of its subsidiaries.

> Mr. Charney agrees in the Support Agreement not to interfere with or attempt to influence the outcome of the Investigation, or access the Company's computer systems.    Until the Suitability

Committee makes its final determination, Mr. Charney will be entitled to receive his base salary as a consultant to the Company and will have no supervisory authority over any employees of the Company.

119.     Accordingly, Charney continues to receive his base salary (which was $832,000 in 2013) during the pendency of the investigation, which is being conducted by an outside consulting group FTI Consulting Inc. ("FTI").  Moreover, the Suitability Committee that will utilize FTI's report in order to decide Charney's fate is populated by three conflicted directors, including two new appointees, one of which will solely be appointed by Charney's new partner, Standard, one of which will be jointly appointed by Standard and the Company, and Defendant Danziger, who was the chair of the Audit Committee at the time of Charney's rampant mismanagement of the Company.

120.     American Apparel shareholders and commentators swiftly reacted to the terms of the Support Agreement.  On July 17, 2014, Bigger Capital Fund, LP, Bachelier LLC and the Bigger Family, significant shareholders in the Company, issued a press release including the full text of a letter they sent to the American Apparel Board, stating in part that "[w]e have become confident that American Apparel's entire Board of Directors (the 'Discredited Board') - all seven of its current members – have caused serious damage to the value and reputation of the Company," and that American Apparel "has been brought to the brink of

financial distress and all this, in our view, because of the reckless actions of the set of directors who were responsible for overseeing our business and protecting the value of our investment."   The letter further stated that Defendants Danziger and Mayer, the two directors who would stay on as Co-Chairmen, "are directly responsible for the value erosion and reputational harm to the Company and as a result have lost the confidence and support of the shareholders and should immediately resign."

121.      On July 23, 2014, pursuant to the Support Agreement, American Apparel filed the Information Statement with the SEC triggering the resignation of the majority of the Board.   The Company also announced four new board members: Standard partner David Glazek and Thomas J. Sullivan, who were Standard's designees, and RadioShack Chief Executive Joseph Magnacca and Colleen B. Brown ("Brown"), who were joint designees of the Company and Standard.   Brown is the Company's first female director.

122.      American Apparel then announced the appointment of Laura A. Lee as a director on August 18, 2014.

123.      Also on August 18, 2014, the Company announced financial results for the quarter ended June 30, 2014.   American Apparel reported a net loss of $16.2 million, in excess of the Company's prior guidance of a $15 million loss

in the quarter, fueled, in part, by a $2 million increase in professional expenses, "the majority of which was related to the suspension of Dov Charney. . . ."

124.    Following the Company's financial issues after Charney's ouster and its poor second quarter results, on August 29, 2014, Standard & Poor's Rating Services ("S&P") lowered its corporate credit rating on American Apparel from CCC to CCC-.  S&P stated that "[t]he downgrade reflects our assessment that a debt restructuring appears inevitable within six months, absent unanticipated significantly favorable changes in the company's circumstances."

125.    A few days later, on September 8, 2014, American Apparel and Standard amended the loan agreement assigned to Standard from Lion Capital to lower the applicable interest rate to a still exorbitantly-high 17.0%, extend the maturity date to April 15, 2021, and eliminate the provision that the removal of Charney as CEO would constitute an event of default.

126.    On September 15, 2014, American Apparel announced the appointment of Robert Mintz to the Company's board, at the request of Lion Capital, which owns warrants in the Company allowing it to designate two Board members.  Like American Apparel's former directors, Greene and Mayer, Mintz has personal ties to Charney.  Mintz attended middle and high school with Charney in Montreal.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

127.     Scott Brubaker ("Brubaker") was appointed on September 29, 2014, to serve as interim CEO while a search for a permanent successor to Charney is conducted.  Brubaker is a managing director of Alvarez & Marsal, a corporate turnaround specialist.  American Apparel also announced that John Luttrell, the Company's CFO and interim CEO after Charney's suspension, was leaving the Company.

128.     Notwithstanding the installation of new executives and directors, key executives hired by Charney remain at the Company, and some have increased their power, including Defendants Danziger and Mayer, as reported by *Bloomberg* on October 1, 2014.  The same *Bloomberg* article stated that Luttrell's departure could make it easier for Charney to return to the Company because Charney and Luttrell "butted heads" when Luttrell was CFO.  On October 23, 2014, American Apparel rehired Senior Creative Director Iris Alonzo, who had served under Charney and had been dismissed after Charney's suspension.

129.     Despite the Board's assertion that it would determine whether to remove Charney from the Company within days after completion of its investigation, Charney currently remains a paid strategic consultant to American Apparel.  He continues to give instructions to staff, visit stores, and represent the Company during conference calls with securities analysts and at trade shows.  The new American Apparel Board, like the former Board, defers to Charney.  On

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

October 1, 2014, *Bloomberg* reported that American Apparel's board "is increasingly open" to retaining Charney.  The same article reported that although Charney is serving as a paid strategic consultant, he was not given supervisory authority over any employees in the agreement that laid out his consulting role, and that his continued direct involvement "has led many employees to believe that Charney may remain at American Apparel in some capacity."

130.     Rather than liberate American Apparel from Charney's decade of illegal conduct, the Board's failure to inform themselves and to take reasonable precautionary measures before suspending Charney gave rise to a situation where Charney may continue in his mismanagement of American Apparel to the detriment of the Company and its shareholders.

## DERIVATIVE ALLEGATIONS

131.     Plaintiffs bring this action derivatively in the right and for the benefit of American Apparel to redress injuries suffered, and to be suffered, by American Apparel and its shareholders as a direct result of the Individual Defendants' violations of state law, including breaches of fiduciary duty and the aiding and abetting thereof.

132.     American Apparel is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

133.    Plaintiffs were shareholders of American Apparel at the time of the transgressions complained of herein and continue to retain their American Apparel shares.

134.    Plaintiffs will adequately and fairly represent the interests of American Apparel and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the Board, is in the best interests of the Company.

135.    The wrongful acts complained of herein subject, and will continue to subject, American Apparel to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

136.    The wrongful acts complained of herein were unlawfully concealed from American Apparel's shareholders.

## DEMAND FUTILITY

137.    When this suit was filed, Plaintiffs did not make any demand on the Board of American Apparel to institute this action since such demand would have been a futile, wasteful and useless act.  The wrongful acts complained of show an abdication by the Individual Defendants of their fiduciary duties of due care and oversight.  Such abdication included, but was not limited to:

(a)    failing to institute sufficient controls to prevent the brazen impropriety of Charney's conduct;

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(b)    failing to take timely action against Charney for his misconduct, despite the length of time that they knew the misconduct was occurring and the material damage they knew it was causing to the Company;

(c)    terminating Charney before obtaining waivers of the provision in the Company's credit agreement requiring that Charney remain at the helm of the Company or the Company could be held in default or securing alternative financing;

(d)    failing to immediately enact a "poison pill" to prevent Charney from amassing a larger percentage ownership in the Company after his termination; and

(e)    agreeing to the one-sided and conflicted Support Agreement.

138.    The misconduct of the Individual Defendants alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

139.    As detailed above, the Individual Defendants were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees.

140.    American Apparel's Board at the time this action was filed was comprised of all of the Individual Defendants: Charney, Chehebar, Danziger,

Greene, Igelman, Mauer and Mayer.  If only four members of this Board are not independent or disinterested, demand is excused as futile.

141.    Defendant Charney is incapable of objectively considering pre-suit demand to bring these claims, inasmuch as he was President and CEO of the Company, receiving extensive salary and other compensation, and continues currently as a paid consultant, and thus depends upon his position for his livelihood.   Accordingly, Charney lacks independence due to his interest in maintaining his executive position at American Apparel.

142.    Charney is further incapable of objectively considering pre-suit demand since the claims directly involve his misconduct, including his breaches of the Company's Code of Ethics and the fiduciary duties he owes to the Company and its shareholders, and the failure of the Board to curb his misconduct and terminate him at an earlier point in time when his misconduct first became known.

143.    Defendant Greene is incapable of objectively considering pre-suit demand to bring these claims because of his personal ties to Charney.  As reported in Businessweek.com on July 9, 2014, Charney hired Greene as a personal consultant and was "one of Charney's confidants on the board."

144.    Defendant Mayer is incapable of objectively considering pre-suit demand to bring these claims because of his personal ties to Charney.  As reported

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

by the same Businessweek article cited above, Mayer has known Charney since 2004, and Charney put Mayer on the Board in 2007.

145.    The Audit Committee Defendants (Danziger, Igelman and Mauer) similarly are disabled from objectively considering pre-suit demand to bring these claims, because as members of the Audit Committee during the relevant period, they face a substantial likelihood of liability for wrongdoing.   The Audit Committee of the Board had oversight responsibilities for the Company's internal controls with respect to accounting and internal control policies and procedures, was required to ensure that the Company was operating in accordance with its prescribed policies, procedures and codes of conduct, and was charged with overseeing the Company's compliance with laws and regulations, human resource matters, and general reputation.   It was their decision as Audit Committee members not to take action, though timely action could have prevented the damages discussed herein, that allowed Defendant Charney to misuse his position at the Company and engage in improper and illegal conduct to the detriment of American Apparel and its shareholders.

146.    The Compensation Committee Defendants (Mauer and Mayer) similarly face a substantial likelihood of liability for wrongdoing, in that they had the responsibility for annually evaluating the performance of the CEO.  Rather than exercise their fiduciary duties to the Company and its shareholders to recommend

Charney's termination, they approved lavish compensation for Defendant Charney despite the Company's spiraling financial condition and stock price, and Charney's rampant misconduct.

147.    The Nominating and Corporate Governance Committee Defendants (Chehebar, Greene and Mauer) similarly face a substantial likelihood of liability for wrongdoing, in that they had the responsibility for recommending individuals qualified to serve as directors and as the CEO of the Corporation, consider corporate governance issues of the Company, and overseeing the evaluation of the Board as a whole and management, including recommending termination of individuals when appropriate.  Rather than exercise their fiduciary duties to terminate Charney for his mismanagement and misconduct, these Defendants allowed Charney to continue in his conduct to the detriment of American Apparel and its shareholders.

148.    Furthermore, the Individual Defendants breached the Company's own Corporate Governance Guidelines by failing to properly monitor and curb the improper actions of the Company's CEO.

149.    Moreover, the Individual Defendants, in approving the problematic Support Agreement, have demonstrated that their loyalty does not lie with American Apparel and its public shareholders.  They, therefore, are incapable

of independently and disinterestedly evaluating a pre-suit demand to bring these claims.

150.    In addition, and as a result of their actions, Defendants Mayer and Danziger will continue to hold onto their positions of power, prestige and profit with the Company as directors.

151.    American Apparel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not caused the Company to file any lawsuits against Charney to attempt to recover for the Company any part of the damages it has suffered and will suffer thereby.

152.    Moreover, despite having knowledge of the claims and causes of action raised by Plaintiffs, the Individual Defendants have caused the Board to refuse to seek to recover for American Apparel for any of the wrongdoing alleged by Plaintiffs herein.  There is no evidence that the Board ever subjected any of the Individual Defendants beyond Charney to disciplinary action, as required by the Company's own codes of conduct and other governing protocols.

153.    The Individual Defendants are dominated and controlled by Charney.  The Individual Defendants knew of Charney's misconduct, but took no action to stop it or to prevent the substantial damage caused thereby to the Company and its shareholders.  The Individual Defendants were required to

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

investigate and take action to prevent damage to American Apparel and its shareholders, but chose to do nothing. Thus, it is clear that the Individual Defendants would have refused to institute this action for the following, among other, reasons:

(a) Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, did, and do, dominate and control the Individual Defendants. Thus, the Individual Defendants could not consider a demand in an independent and disinterested manner;

(b) The acts complained of herein are illegal and improper and constitute breaches of fiduciary duties by the Individual Defendants and are, thus, incapable of ratification;

(c) Defendant Charney is personally responsible for, or directly oversaw, many of the improper acts complained of herein. He also personally benefitted from much of his wrongdoing at the expense of the Company. The other Individual Defendants also benefitted at the expense of the Company. They each ensured their re-election to the Board by failing to take reasonable and prudent action to prevent Charney's acts of misconduct and the substantial damages caused to the Company thereby;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the Individual Defendants would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action.   Specifically, the Board was dependent upon Charney for their positions as members of the Board and so have or had an interest in disputing the complaint to remain in Charney's good favor.  The Individual Defendants have shown their inclination to court Charney's good favor because, even though they had more than sufficient reason to terminate Charney's employment for cause, they offered him a consulting position for several million dollars and a severance package.  It was only when he declined this offer that they chose to initiate a process to terminate his employment;

(e)     Publicly traded companies, such as American Apparel, typically carry Director & Officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that would

foreclose a recovery from the insurers in the event that American Apparel sues to recover its damages from the Individual Defendants;

(f)     The Individual Defendants were aware of, but failed to investigate, numerous red flags of illegal or improper conduct and, had they done so, could have taken – and were required to take – timely action to prevent, or at least minimize, the damages caused; and

(g)     The Individual Defendants herein, received, and Defendants Danziger and Mayer continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of American Apparel.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Individual Defendants also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

154.     Additionally, each of the Individual Defendants faces a substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a

reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

155.   Demand on the seven member Board was thus futile and excused.

## COUNT I

### (Derivatively Against the Individual Defendants for Breach of Fiduciary Duty)

156.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

157.   The Individual Defendants owed and owe American Apparel and its shareholders fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe American Apparel and its shareholders the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

158.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

159.   Each of the Individual Defendants had actual or constructive knowledge that Charney was consistently engaging in inappropriate and illegal conduct, causing harm to the Company, yet ignored his actions for years without taking any step to terminate him until the Company's financial situation was dire. The Individual Defendants only took steps to terminate Charney after Defendants

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Danziger, Greene and Mayer were re-elected to the Board. They did so without fully preparing the Company for the financial implications of Charney's termination and enacting an appropriate shareholder rights measures to prevent him from amassing additional ownership percentage of the Company. The Individual Defendants' failure to take such reasonable and required action placed the Company in the situation where it had to agree to the problematic Support Agreement. These actions were not taken by the Individual Defendants in good faith and do not reflect the exercise of prudent business judgment.

160. The Individual Defendants caused or allowed American Apparel to lack requisite internal controls, which enabled Charney to engage in the inappropriate and illegal conduct specified herein.

161. The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

162. In addition, by their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing American Apparel in a manner consistent with the operations of a publicly held corporation.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

163.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, American Apparel has sustained significant damages, including spiraling losses, the astronomic cost of borrowing, defaults on credit facilities, the inability to secure insurance at a reasonable premium, and the cost of defending against numerous lawsuits and the investigations of Charney.  As a result of their misconduct, the Individual Defendants are liable to the Company.

164.     Plaintiffs, on behalf of American Apparel, have no adequate remedy at law.  Only through this Court's equitable powers can Plaintiffs, on behalf of American Apparel, be fully protected from the immediate and irreparable harm that the Individual Defendants' actions and failure to act have caused.

## COUNT II

### (Derivatively Against the Individual Defendants for Indemnification)

165.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

166.     As alleged herein, the Individual Defendants, acting as directors of American Apparel, breached their fiduciary duties to the Company and its shareholders.

167.     American Apparel has suffered significant and substantial injury as a direct result of the Individual Defendants' breaches of their fiduciary duties as

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

alleged herein.   Plaintiffs, on behalf of the Company, seek relief from the Individual Defendants on the theory of indemnity for all damages that occurred as a result of the Individual Defendants' violations of their fiduciary duties.

## COUNT III

### (Derivatively Against the Individual Defendants for Aiding and Abetting)

168.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

169.    The Individual Defendants have acted and are acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their fiduciary duties to American Apparel, and have participated in such breaches of fiduciary duties.

170.    The Individual Defendants have knowingly aided and abetted each other in committing the wrongdoing alleged herein.

171.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including injunctive relief, in their favor and on behalf of American Apparel, and against the Individual Defendants as follows:

A.    Against all of the Individual Defendants and in favor of American Apparel for the amount of damages sustained by the Company as a

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

result of the Individual Defendants' breaches of fiduciary duties and abuse of control;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder;

C.     Declaring that the Individual Defendants have breached their fiduciary duties, or aided and abetted such breach, to American Apparel;

D.     Requiring the Individual Defendants to remit to American Apparel all of their salaries, fees, unit awards and other compensation for the periods when they breached their fiduciary duties;

E.     Directing American Apparel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote amendments to the By-Laws and Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies, including measures to:

   i.   Strengthen the Board's supervision of regulatory compliance by the Company, including the development of procedures

for greater shareholder input into the policies and guidelines of the Board and Audit Committee;

ii.  Remove Defendants Danziger and Mayer from the Board and replace them with new members;

iii.  Mandate that the Audit Committee meet to review the Company's compliance with legal, regulatory, and ethical norms;

iv.  Permit American Apparel's shareholders beyond Standard and Charney to nominate at least five candidates to the Board of Directors;

v.  Enjoin the Suitability Committee from reviewing Charney's misconduct and future with the Company and appoint a truly neutral body to oversee the investigation and recommendation.

F.  Awarding to Plaintiffs costs, expenses and disbursements in connection with this action, including reasonable attorneys' fees, accountants', experts' and consultants' fees, costs, and expenses, and, if applicable, pre-judgment and post-judgment interest; and

G.  Awarding Plaintiffs such other relief as this Court deems just and proper.

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: November 7, 2014                    Respectfully submitted,

WEISSLAW LLP

By:    /s/ David C. Katz
David C. Katz (admitted *pro hac vice*)
dkatz@weisslawllp.com
WEISSLAW LLP
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
      -   and -


Leigh A. Parker (SBN 170565)
lparker@weisslawllp.com
WEISSLAW LLP
1516 South Bundy Drive, Suite 309
Los Angeles, CA 90025
Telephone: (310) 208-2800
Facsimile:  (310) 209-2348


Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco, CA 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498
      -   and –

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Melinda A. Nicholson
melinda.nicholson@ksfcounsel.com
Michael J. Palestina
michael.palestina@ksfcounsel.com
KAHN SWICK & FOTI, LLC
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Co-Lead Counsel for Plaintiffs*

VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT